United States Courts
Southern District of Texas
FILED

June 30, 2025

Nathan Ochsner, Clerk of Court

United States District Court
Southern District of Texas

**ENTERED**

June 30, 2025

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| XOCHITL ZYTLALI GONZALEZ, | § |
| | § |
| Plaintiff, | § |
| | § |
| VS. | § CIVIL ACTION NO. 7:23-CV-280 |
| | § |
| FRANK BISIGNANO,[1] | § |
| | § |
| Defendant. | § |

## REPORT AND RECOMMENDATION

Plaintiff Xochitl Zytlali Gonzalez, proceeding with retained counsel, filed this action pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner of Social Security's denial of disability benefits. Plaintiff—at the age of seven—was found disabled and has been receiving SSI disability since that age. Upon approaching her eighteenth birthday, the Social Security Administration initiated an "age-eighteen redetermination," ultimately finding her ineligible for continued disability benefits as an adult. (Tr. 28, 142-44.)[2] Plaintiff challenged this decision, asserting that her conditions of depression, anxiety, and bipolar disorder (among other ailments) prevented her from working. An Administrative Law Judge (ALJ) found that, while Plaintiff's mental impairments limited her to a "full range of work at all exertional levels but with [ ] nonexertional limitations," she is still capable of performing jobs that exist in significant numbers, and thus she is not disabled. (Tr. 20.)

---

[1] Although this action was originally filed against Kilolo Kijakazi, on May 7, 2025, Frank Bisignano was sworn in as the Commissioner of Social Security. As such, he is the proper Defendant in this action.

[2] The Commissioner has filed a transcript of the record of the administrative proceedings (Docket No. 7), which will be cited as "Tr." The specific page of the administrative transcript will be cited by reference to the page numbers in bold typeface located in the bottom right corner of the transcript pages.

In challenging the Commissioner's denial of benefits, Plaintiff claims that the ALJ erred in the following two ways: 1) by failing to "consider evidence of special education, highly structured environments, and prior findings"; and 2) by failing to properly determine her mental residual functional capacity (RFC). (Docket No. 12, at 1.)  Pending before the Court are the parties' cross motions for summary judgment. (Docket Nos. 12, 15.)

A federal court may review the Commissioner's denial of benefits only to determine whether it is supported by substantial evidence and whether the proper legal standards were applied; a court may not re-weigh the evidence or substitute its judgment for the Commissioner's. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).   After carefully considering the record in light of the deferential standard of review that applies, the undersigned concludes that Plaintiff's claim lacks merit.

The record shows that the ALJ's careful and thorough written opinion shows that she properly considered the evidence in the record, including Plaintiff's prior school records.  In addition, the record shows that the ALJ's mental RFC determination is supported by substantial evidence.  Accordingly, for the reasons discussed further below, it is recommended that Plaintiff's summary judgment motion be denied, that the Commissioner's motion be granted, that the Commissioner's decision be affirmed, and that this action be dismissed.

## I. BACKGROUND

In November 2006, Plaintiff—at the age of five—applied for Supplemental Security Income (SSI) under sections 216(i) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. (*See* Tr. 346.)  She was subsequently found to be disabled, and she has been receiving SSI disability benefits since August 28, 2008. (Tr. 130, 142.)  As she was approaching the age of majority, the Social Security Administration initiated an "age-eighteen redetermination,"

ultimately finding her ineligible for continued disability benefits as an adult. (Tr. 218.)  The SSA determined that Plaintiff's disability ended on December 11, 2019.  (Tr. 131, 142, 218-21.)

In her redetermination, Plaintiff identified depression, anxiety, bi-polar disorder, obesity, and stomach issues as the conditions that prevented her from working.  (Tr. 58, 861, 867, 878, 899.)  Plaintiff's application was denied initially and on reconsideration.  (Tr. 142-44.)  Plaintiff then requested a hearing before an ALJ, which was held on February 2, 2023.[3]  (Tr. 49-69.)  The ALJ issued a written decision on April 26, 2023, finding that Plaintiff was not disabled because she was able "to perform a full range of work at all exertional levels but with [ ] nonexertional limitations" that included jobs existing in significant numbers in the national economy.  (Tr. 15-28.)

Plaintiff filed a request with the Social Security Administration's Appeals Council to review the ALJ's adverse decision.  The Appeals Council denied review, rendering the ALJ's decision the Commissioner's final decision for purposes of judicial review.  (Tr. 1-8.)  In considering Plaintiff's challenge to the ALJ's decision, the evidence in the record will be summarized.[4]

A.    **Education, Work Experience, and Activities**

At the time of the administrative decision, Plaintiff was 22 years old.  Plaintiff earned a high school diploma, with special education accommodations.  (*See* Tr. 57.)  On January 17, 2017,

---

[3] On November 1, 2022, Plaintiff was also present at an administrative hearing.  However, this hearing was postponed after the ALJ determined that she was "not familiar with the social security process" and because she did not "seem to understand [her] rights regarding representation." (Tr. 88.)

[4] The Court must "scrutinize" the record to determine whether the ALJ's decision is supported by substantial evidence. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).  The undersigned has thoroughly reviewed the medical records and other evidence, which will be summarized above.

when Plaintiff was 16 years old, her "Special Education Inclusion Teacher," Mrs. Estela Garcia,

filled out a "Teacher Questionnaire" regarding Plaintiff's abilities.  (Tr. 782-89.)  Mrs. Garcia

found Plaintiff to have "a serious problem" in the following: 1) acquiring and using information;

2) attending and completing tasks; and 3) interacting and relating with others.  (Tr. 783-85.)  In

addition, Mrs. Garcia noted that Plaintiff "constantly needs reminders and lacks to be

independent." (Tr. 787.)  Mrs. Garcia's overall assessment included the following:

> Student behaves but can be difficult and does not comply.  Her behavior does reveal
> concerns with her poor attention and concentration, and noncompliance with
> teacher directives.  Her English and Math teachers report . . . that they rate her
> below average to average emotional, behavioral, and social skill.  Due to the
> student's diagnosed ADHD, student would benefit from the opportunity to repeat
> and explain instructions given in the classroom.

(Tr. 789.)  In addition, the following is a summary of Plaintiff's educational records,[5] as provided

by her:

> Ms. Gonzalez's special education records show that even with
> accommodations, such as orally administered examinations and reduced
> examinations length, she did not meet state standards in reading, math, science, or
> social studies, and her behavior was impeding her learning.  (Tr. 674-75, 678, 680,
> 692 (accommodations checklist).)
>
> When she was nearing graduation, Ms. Gonzalez was still behind
> academically despite accommodations, and did not meet state standards in English,
> algebra, biology, or United States history, but passing these tests was not required
> for graduation.  (Tr. 794-95, 797, 799 (discussing graduation requirements).)  Ms.
> Gonzalez could "be difficult[] and d[id] not comply. Teacher information did reveal
> behavior concerns with her poor attention and concentration[] and noncompliance
> with teacher directives."  (Tr. 807.)
> ….
> Undisputed evidence showed that Ms. Gonzalez had difficulty
> concentrating in school, "anger and social issues," hardly had friends due to
> impulsivity and anger issues, impatience, and distractions, and she did not care for
> her personal needs such as hygiene, washing her clothes, or taking medications.
> (Tr. 755-58.)

---

[5] The record includes additional educational records, which the undersigned has reviewed.
(*See* Tr. 378-540, 588-658, 668-751, 792-859.)

> Ms. Gonzalez's special education teacher observed daily, severe problems in several areas of functioning, including acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for herself. (Tr. 782-85.) She "constantly need[ed] reminders and lack[ed] (skills) to be independent." (Tr. 787.)

> Based on Ms. Gonzalez's special education teacher's report (Tr. 782-87), the report of Ms. Gonzalez's mother (Tr. 755-58), and her medical records at the time (Tr. 1262-1296), state agency psychologist Thomas VanHoose, PhD, opined that Ms. Gonzalez's childhood disability continued based on her functionally equaling a listing. (Tr. 125-29.)

(Docket No. 12, at 4-5.)

After completing high school, Plaintiff attended college briefly (for about one semester) before dropping out due to failing "some classes." (Tr. 57.) Plaintiff has no past work experience. (Tr. 57, 366-77, 936.) Plaintiff lives with family; primarily, with her mother. (Tr. 60, 878, 904.)

As part of her disability redetermination, Plaintiff filed a "Function Report,"[6] in which she described her "illnesses, injuries, or conditions" as follows:

> I suffer from severe anxiety and depression problems as well [as] anger issues and pending new diagnosis due to concerns of possible bipolar disorder. I am unable to leave home most days because of my severe anxiety and issues communicating with others. (Dysthymic Disorder) (Social Phobia). Also [I] had a recent surgery.
> ....
> I am unable to work due [to] my social anxiety and depression – dysthymic disorder. I feel very stressed out, and being out in public is difficult to cope with. I am also very weak [and] unable to walk for long periods of time.[7]

(Tr. 878, 904.)

---

[6] In fact, Plaintiff filled out two such "Function Report[s]," one in October 2019, and the other about three months later, in January 2020. (Tr. 878-85, 904-11.) Both are summarized in this report. In addition, when Plaintiff was 15 years old, her mother filled out a similar function report. (Tr. 752-59.) According to her mother, Plaintiff was having difficulty concentrating in school, and also in interacting with others due to "anger and social issues." (Tr. 755.) Plaintiff's social activities were limited "because she is impulsive and has anger issues." (Tr. 757.) Plaintiff was also having difficulty taking care of her personal needs and her impatience interfered with ability to stay on task. (Tr. 758-59.)

[7] Plaintiff has at times also identified other conditions that prevent her from working, such as ADHD, seizures, and stomach issues. (*See* Tr. 74, 555, 775, 788, 861, 866, 899.)

Plaintiff describes her typical day to include a lot of sleeping, watching television, but staying indoors. (Tr. 879, 905.) She does not like to leave the house or be around people due to her anxiety. (*Id.*) She has a dog but her sister or her home health provider help to take care of it. (*Id.*) Plaintiff is able to physically take care of her personal activities of daily living, such as dressing, bathing, feeding, and using the restroom. (*Id.*) However, she requires verbal reminders to care for herself and take her medications. (Tr. 880, 906.) Plaintiff is able to prepare simple meals, but she is "unable to eat regular meals due to ulcers." (*Id.*)

As to her ability to do "house and yard work," she is unable to do chores due to overwhelming weakness [and] lack of energy." (Tr. 906.) She may be able to sweep for about 10 minutes, but most of the chores are completed by her mom or her home health provider. (Tr. 880, 906.) Plaintiff does not leave her house often, due to her "social phobia," "severe anxiety [and] panic attacks." (Tr. 881, 907.) About once a week, Plaintiff will go shopping to buy "personal hygiene necessities." (*Id.*) According to Plaintiff, handling her finances is "challenging." (*Id.*) Her hobbies and interests include watching television, walking her dog, reading, and attending school. (Tr. 882, 908.) Although, "public classes are more challenging" for her. (Tr. 908.) She has "no interest in anything social with friends or family." (Tr. 909.)

As to her physical abilities, Plaintiff is able to walk for about 10 minutes before needing to take a break. (Tr. 883, 909.) She is easily distracted, and her ability to follow written and verbal instructions is "50% to 75%." (*Id.*) She is able to "get along with authority figures" as long as "its not prolonged face to face contact" and "they don't make [her] mad." (*Id.*) Plaintiff does not handle stress or changes in routine well due to her "constant" panic attacks. (Tr. 884-910.) Stress

6

can make her "want to punch something or hurt [herself" and routine changes make her "uneasy and uncomfortable."[8] (*Id.*)

## B.    The Medical Evidence

Plaintiff's medical records date back to 2004, when she received a "Psychiatric Evaluation" at the age of three.[9] (*See* Tr. 950-52.) Plaintiff presented with a history of developmental delays, increased energy, poor concentration, and increased restlessness.  (Tr. 950.)   Her mental examination showed a "hyperactive, impulsive female" who was "restless and anxious." (Tr. 951.) Ultimately, Alex D. Kudisch, M.D., a specialist in child psychiatry, diagnosed Plaintiff with Disruptive Disorder, NOS, Anxiety Disorder, NOS, and Expressive Receptive Language Disorder. (Tr. 952.) Dr. Kudisch referred Plaintiff for additional psychological testing, individual and family therapy, and parenting education.  (*Id.*)

Plaintiff's diagnosis of Attention Deficit Hyperactivity Disorder-Combined (ADHD-C) goes back as far as March 2, 2006.  (Tr. 955.)  In addition, going back to 2006, Plaintiff has been prescribed Lamictal, as well as Focalin.[10]  (Tr. 969-70.)  She has also received ongoing outpatient

---

[8] Plaintiff's home health provider, Perla Basulto Rivera, filed a "Function Report – Adult – Third Party," which is largely consistent with the "Function Report" that was filed by Plaintiff. (*Compare* Tr. 878-85, *and* Tr. 904-11, *with* Tr. 887-94.)  Ms. Rivera stated that she has known Plaintiff for "six years," and as her provider she helps her with "grooming [and] cleaning . . . about 16 [hours] a week."  (Tr. 887.)  In considering her assessment, the ALJ found that Ms. Rivera was properly classified as a "non-medical source who has not seen the claimant in a professional medical capacity."  (Tr. 22.)

[9] Although there is evidence in the record which supports Plaintiff's physical ailments, such as high blood pressure and obesity, the ALJ found those to be mild in nature.  (Tr. 18.)  In addition, Plaintiff is not challenging the ALJ's decision as it relates to her physical ailments.  (*See* Docket No. 12.)  As such, this summary of the medical evidence will focus on those impairments that are relevant to Plaintiff's application for disability benefits and, more specifically, to those impairments that are most relevant to her alleged points of error.

[10] Lamictal is prescribed to treat epilepsy or generalized seizures, and Focalin is prescribed to treat ADHD.  NURSING 2008 DRUG HANDBOOK 438, 529 (28th ed. 2008).

treatment for ADHD since early childhood, at such medical facilities as the Renaissance Outpatient Rehabilitation Center, L.L.C. (*See, e.g.*, Tr. 1022-70.) There are other medical records pertaining to Plaintiff's childhood (*see* Tr. 946-1007, 1022-1261), but this summary will continue its focus on the medical records which are closest in time to Plaintiff's age-eighteen (18) disability redetermination.[11]

      1.    Recent Medical Treatment

Beginning in July of 2017, Plaintiff presented to Hildebrando Salinas, M.D., an adolescent psychiatrist, for a "bariatric surgery evaluation." (Tr. 1281.) Plaintiff returned to Dr. Salinas four times over the next two years. (*See* Tr. 1285 (October 2017), 1289 (March 2018), 1293 (May (2019).) Other than complaining of panic attacks on October 31, 2017, Plaintiff denied experiencing depression or anxiety during these visits. (Tr. 1281-96.) Upon examination, Dr. Salinas found Plaintiff to have "no apparent serious mental status abnormalities." (Tr. 1283, 1287, 1290, 1295.)

On October 15, 2019, Plaintiff self-referred to Elisa G. Sanchez, M.D., a treating psychiatrist.[12] (Tr. 1421.) Plaintiff complained of "constant anxiety" and being "angry and depressed a lot lately." (*Id.*) She disclosed a previous suicide attempt, but she denied current suicidal ideations. (Tr. 1421, 1423.) Plaintiff also denied currently experiencing any depressive symptoms. (Tr. 1422.) Dr. Sanchez found her affect to be "bright, responsive and appropriate" and her thought processes were "coherent, logical, [and] relevant." (*Id.*) Dr. Sanchez diagnosed Plaintiff with dysthymic disorder and social phobia, generalized. (Tr. 1423.)

---

[11] In her motion for summary judgment, Plaintiff summarized the relevant medical evidence, which the undersigned found helpful. (Docket No. 12, at 5-17.)

[12] In fact, between October 2019 and January 2023, Plaintiff was seen by Dr. Sanchez (or her office staff) a total of twelve times. (*See* Tr. 1414, 1419, 1421, 1460, 1463, 1465, 1468, 1471, 1474, 1510, 1512, 1514.)

Plaintiff returned to Dr. Sanchez on November 21, 2019, complaining of anxiety and anger. (Tr. 1419.) Plaintiff's mood seemed depressed. (Tr. 1420.) Dr. Sanchez noted that she was compliant with her medications and that her "condition is under partial control with current medications."[13] (*Id.*) When she returned to Dr. Sanchez on January 30, 2020, she had run out of her medications due to a missed appointment.[14] (Tr. 1414.) Plaintiff was depressed and tearful due to the stress that school was causing her. (*Id.*) Plaintiff requested that Dr. Sanchez write a letter to her school detailing her need to use a recording device in class and to allow for additional time to complete her tasks and take tests. (Tr. 1415.)

Dr. Sanchez continued to treat Plaintiff through January of 2023, consistently noting her diagnosis of bipolar disorder, depression, and anxiety. (Tr. 1460-1515.) Consistent with this, Plaintiff has regularly complained of symptoms related to her depression and anxiety. (*Id.*) Plaintiff mentioned that school was one of the primary stressors in her life. (Tr. 1414, 1422, 1465, 1468, 1510.) However, her symptoms have waxed and waned in severity according to her subjective complaints. For example, on many occasions Plaintiff reports feelings which reflect improvement. (*See* Tr. 1460 (doing all right), 1465 (doing good), 1466 (feeling better), 1468 (feeling so-so), 1471 (doing good), 1510 (doing well).) On the other hand, she reported feeling "poorly" at times as well. (*See* Tr. 1474, 1512, 1514.)

In addition, Dr. Sanchez has repeatedly noted Plaintiff's compliance with her treatment plan, including her mediations. (Tr. 1460-1515.) In fact, at most of these visits, Dr. Sanchez

---

[13] According to Plaintiff, she is currently prescribed and taking Focalin, quetiapine, and Trileptal, for her mental health issues. (Tr. 59, 934, 942.) As noted, Focalin is prescribed to treat ADHD. NURSING 2008 DRUG HANDBOOK 529 (28th ed. 2008). In addition, quetiapine is prescribed to treat "depression associated with bipolar disorder," and Trileptal is prescribed to treat epilepsy. (*Id.* at 444, 517.)

[14] Dr. Sanchez noted that Plaintiff's lack of compliance may have been due to a recent hospitalization for "possible gallstones." (Tr. 1415.)

concluded that Plaintiff's symptoms were either partially controlled (Tr. 1420, 1462, 1464, 1467, 1515), or completely controlled (Tr. 1469, 1473, 1511, 1513), by her medications. Although, Dr. Sanchez also noted on at least two occasions that Plaintiff's symptoms were not controlled with medications. (*See* Tr. 1415, 1475.)

In addition to Dr. Sanchez, Plaintiff has repeatedly visited Martha E. Adame, a Licensed Professional Counselor, for mental health treatment. At her initial assessment, Ms. Adame diagnosed Plaintiff with depression, anxiety, and ADHD. (Tr. 1517.) She noted that Plaintiff was also overweight and registered a GAF score of 50.[15] (*Id.*) In total, between September 2021 and January 2023, Plaintiff presented to Ms. Adame for counseling services a total of sixteen (16) times. (Tr. 1516-32.)

Ms. Adame noted her history of anxiety and depression. (*Id.*) Plaintiff regularly expressed that school was a main stressor in her life.[16] (*See* Tr. 1521, 1523, 1524, 1528.) Although she regularly expressed feelings of depression and anxiety, Plaintiff also explained at times that was feeling "good" and doing "better."[17] (Tr. 1518, 1526, 1527.) Not surprisingly, Ms. Adame

---

[15] "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'" *Boyd v. Apfel*, 239 F.3d 698, 700 n.2 (5th Cir. 2001) (quoting AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL at 32 (4th ed. 1994)). A GAF score is a "subjective" assessment that may or may not be consistent with objective findings. *Foster v. Astrue*, 277 F. App'x 462, 464 (5th Cir. 2008) (unpublished). As a reference point, a GAF score of below 50 represents a "serious impairment in social, occupational, or school functioning" and may be manifested in symptoms such as suicidal ideation and severe obsessional rituals. *Boyd*, 239 F.3d at 702. A GAF score of 61-70 "indicates only mild symptoms or some difficulty in social or occupational functioning." *Ray v. Barnhart*, 163 F. App'x 308, 313 (5th Cir. 2006) (unpublished); *Sims v. Barnhart*, 309 F.3d 424, 427 n.5 (7th Cir. 2002).

[16] In addition, Plaintiff explained to both Dr. Sanchez and Ms. Adame that the Social Security Administration was causing her tremendous stress because it was attempting to collect overpayments from her. (*See* Tr. 1474, 1514, 1527, 1529.)

[17] In 2022, Plaintiff presented twice to the RGV Adult & Internal Medicine Specialists. On both occasions, she denied experiencing any depressive symptoms. (Tr. 1490-92 (August 2022), 1494-95 (February 2022).)

assessed that many of the sessions with Plaintiff "went well." (Tr. 1519, 1522, 1531.)  In addition, as a result of the counseling sessions, Plaintiff "showed understanding," was receptive, and appeared "calm by [the] end of the session." (Tr. 1520, 1522, 1529.)

      2.    Mental RFC Determinations

On November 20, 2019, Plaintiff presented to Monica Hernandez, Ph.D., at the South Texas Psychological Center for a "Clinical Interview and Mental Status Exam." (Tr. 1302-07.) As to her subjective complaints, Plaintiff "has been experiencing depressive symptoms and elevated levels of anxiety in 2017." (Tr. 1303.)  She angers easily and has decreased interest in social activities. (*Id.*)  Plaintiff "spends her day caring for her dogs, completing chores in her home, and also taking frequent naps." (*Id.*)  "[S]he is able to complete chores in her home" without "[p]rodding and supervision." (*Id.*)  According to her, "[s]he is able to bathe and dress [her]self without assistance." (*Id.*)  Plaintiff is complaint with her treatment and medication; however, she reports that her depressive symptoms and anxiety are increasing. (Tr. 1304.)

Upon examination, Plaintiff "presented with a flat affect and somber mood," but she was "appropriately dressed" and "had good grooming and hygiene." (Tr. 1302, 1304.)  She was active and cooperative; however, her "[p]sychomotor activity was retarded." (Tr. 1304.)  Plaintiff "was oriented to person, place, time, and situation." (Tr. 1305.)  Dr. Hernandez "did need to repeat questions and instructions in order for her to understand," but "her intelligence appeared to be average." (*Id.*)  Plaintiff's "[r]emote memory was adequate," and her "[i]mmediate memory was fair." (*Id.*)  "She was able to provide information related to current news and events," such as naming three United States presidents. (*Id.*)  Plaintiff "could do simple, but not complex math," and she "was able to perform serial 3's and 7's." (*Id.*)  Dr. Hernandez noted observing "[m]inimal

difficulties with attention and concentration." (*Id.*)  Plaintiff showed adequate judgment and fair insight." (*Id.*)

Ultimately, Dr. Hernandez diagnosed Plaintiff with the following: 1) major depressive disorder, severe; 2) generalized anxiety disorder; and 3) social anxiety disorder. (*Id.*) She assessed Plaintiff with the following functional capacity:

> [Plaintiff] can understand, carry out, and remember instructions. She cannot sustain concentration and persist in a work-related activity at a reasonable pace. She cannot maintain effective social interaction on a consistent and independent basis with supervisors, co-workers, and the public. She experiences difficulties coping with the pressures of a competitive work setting.

(Tr. 1306.) Dr. Hernandez concluded that Plaintiff's prognosis was "guarded." (*Id.*)

On December 11, 2019, a state agency medical expert, Mark Schade, Ph.D., reviewed Plaintiff's medical records and performed a mental RFC assessment. (Tr. 134-41.) Dr. Schade acknowledged Plaintiff's history of ADHD, depression, and anxiety; in fact, he determined that her "medically determinable impairments" of "depressive, bipolar and related disorders" and "anxiety and obsessive-compulsive disorders" were "severe." (Tr. 136.) Dr. Schade found that Plaintiff was only "moderately limited" in the following: 1) ability to understand and remember detailed instructions; 2) ability to carry out detailed instructions; 3) ability to maintain attention and concentration for extended periods; and 4) ability to complete a normal workday/workweek without interruptions. (Tr. 139-40.) As such, he determined that she is able to "understand, remember and carry out only detailed instructions, make decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in the routine work setting." (Tr. 140.) In making this determination, he found that Plaintiff's allegations were only "partially consistent" with the medical evidence of record, and

that during her consultative examination she "endorses numerous [symptoms] which are convincingly denied elsewhere in the [medical evidence of record.]" (Tr. 137.)

On October 5, 2020, Michael Heffernan, Ph.D., conducted a "Psychological Examination" of Plaintiff "by telehealth/video technology." (Tr. 1425-29.) Plaintiff "has a long history of being in special education due to having intellectual deficits," and she "was diagnosed at age 5 with ADHD." (Tr. 1425.) Plaintiff needs assistance and supervision in performing all of her activities of daily living, such as cooking, cleaning, shopping, and handling her finances. (Tr. 1426.) She "lacks a more complex vocabulary," and "her inability to communicate effectively" hampers her social interactions. (*Id.*) "Her speech was slow and hesitant," her "thoughts were observed to proceed at below normal rate." (*Id.*)

Plaintiff appeared depressed and her "affect was seen as blunted." (Tr. 1427.) However, "[s]he denied feeling depressed all the time and she denied feeling worthless." (*Id.*) She stated that she "enjoys music and playing with animals." (*Id.*) Plaintiff "was oriented to person, place, time, and situation." (*Id.*) Based on her inability to answer general knowledge questions her "intelligence is estimated to be below normal limits." (*Id.*) Plaintiff's memory appeared impaired as well. (*Id.*) She was unable to count backward from 20 "by 2's" or "by 3's." (*Id.*)

Ultimately, Dr. Heffernan diagnosed Plaintiff with the following: 1) adjustment disorders with depressed mood; and 2) educational problems. (Tr. 1428.) He assessed Plaintiff with the following functional capacity:

> [Plaintiff] is <u>not able</u> to understand, and learn instructions involving job-related tasks. She is <u>not able</u> to apply information, and carry out instructions involving job-related tasks. She is <u>not able</u> to remember job instructions. She is <u>not able</u> to sustain concentration and persist in work-related activity at a social interaction consistently, with supervisors, co-workers, and the public. She is <u>not able</u> to deal with normal pressures in a competitive work setting.

(Tr. 1428-29 (internal citations omitted).)  Dr. Heffernan concluded that Plaintiff's prognosis was "poor."  (*Id.*)

On October 23, 2020, another state agency medical expert, Joel Forgus, Ph.D., reviewed Plaintiff's medical records, and likewise acknowledged her depression, anxiety, and ADHD.  (Tr. 1435, 1437, 1441.)  Dr. Forgus's findings were largely consistent with Dr. Schade's; however, he found Plaintiff "markedly limited" in her ability to carry out detailed instructions.  (*Compare* 139-40, *with* Tr. 1456-57.)  Specifically, Dr. Forgus determined that Plaintiff is able to "understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, [and] respond appropriately to changes in routine work setting." (Tr. 1458.)  Dr. Forgus concluded that Plaintiff's "alleged limitations are not fully supported by [evidence of record]" due to inconsistencies in her subjective statements and complaints.  (Tr. 1446.)

Most recently, on January 22, 2023, Martha Adame, LPC, evaluated Plaintiff using a "Mental Impairment Questionnaire," after treating her for about a year.  (Tr. 1482-86.)  Ms. Adame noted that Plaintiff's current diagnosis included bipolar disorder, current episode mixed, and ADHD (inattentive).  (Tr. 1482.)  According to her evaluation, Plaintiff had "marked" or "extreme" limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  (Tr. 1484-86.)  Specifically, Ms. Adame determined that Plaintiff's limitations including the following:

- Following directions, managing stress, and getting along with others;
- Gets anxious, confused, and forges easily;
- Gets nervous around others and has speech problems; and
- Is very forgetful and has poor judgment.

14

(Tr. 1484-86.)  Ms. Adame assessed Plaintiff's prognosis as "very poor even with meds due to low cognitive functioning."  (Tr. 1483.)

## C.    The Evidentiary Hearing

The ALJ held the evidentiary hearing on February 2, 2023.[18]  (Tr. 49-69.)  Two witnesses testified: Plaintiff and a vocational expert, Donald Rue.[19]  Plaintiff was represented at the hearing by her attorney, Justin Raines.[20]  She was 22 years old at the time of the hearing.  (Tr. 54.)  Mr. Raines made a brief opening statement, in which he highlighted Plaintiff's impairments.[21]  He stressed that "[t]he theory of the case is that the claimant meets a listing for major depressive disorder."  (Tr. 54.)  He argued that "the medical evidence as it progresses through time, really shows the onset and severity and worsening of her depression."  (Tr. 54-55.)  He further argued that the ALJ should give preference to her treating medical sources because they agree "that she would not be able to function in a competitive work environment."  (Tr. 55.)

Prior to questioning by Mr. Raines, the ALJ discussed with Plaintiff her education history. Plaintiff explained that she received a high school diploma, but the school district "sent [her] to some other school to help [her] graduate."  (Tr. 56.)  She "tried out college, but [she] failed some classes even with [her] accommodations and stuff, so [she] just gave up on it."  (Tr. 57.)  Plaintiff has never held a job, and she was not exactly sure why she received disability as a child.  (*Id.*)  In

---

[18] "Due to the extraordinary circumstance that's presented by the coronavirus pandemic," the hearing was conducted "by telephone."  (Tr. 51.)  Plaintiff had no objection to the hearing being held telephonically.  (Tr. 53.)

[19] Mr. Rue is an "impartial vocational expert who is not an employee of the Social Security Administration."  (Tr. 52.)

[20] Mr. Raines explained that he represented Plaintiff through "RGV Disability."  (Tr. 52.)

[21] Mr. Raines also explained at the beginning of the hearing that the administrative record was incomplete, as additional records from Plaintiff's "treating counselor, and LPC" were still pending.  (Tr. 54.)

response to the ALJ, Plaintiff summarized why she believes her disability prevents her from

working:

> My – well, I have phobias.  My depression, and my anxiety, and my bipolar
> disorder.  It's, like, everyone is looking at me, and I overthink a lot.  If they put me
> to do something, like, a task or a job, I cannot complete it because – if I can't
> complete it, I feel bad about it for the rest of the few days, like, a week.  I just feel
> mad and sad at the same time.  I can't – I get angry, like a lot.  I can't control my
> anger.  It gets to me.  Most days I don't have the energy, like, to get up.  I just feel
> depressed.  And I tried giving school a chance, but I just failed, and it just made me
> more sad because I'm not smart enough.  I get a lot of anxiety.  I'm sorry.  I've
> been going to with my counselor and my psychiatrist, they help me out a bit.  I
> don't want to lose my help.  I'm always worried.  I'm paranoid.  I have social
> phobia.  I don't like interacting with people.  It's hard for me to talk sometimes.
> It's hard.

(Tr. 58.)  At the time of the hearing, she was taking quetiapine and oxcarbazepine, as prescribed.

(Tr. 59.)  Plaintiff experiences some side effects from the medications as well.  Plaintiff sees her

counselor every two weeks, who helps her with her anger and personal issues.  (*Id.*)

Plaintiff lives with her mom, and she does not believe she can live on her own because she

"can't take care of [her]self."  (Tr. 60.)  Plaintiff's mom helps her with cleaning, and also "has to

remind" her to take care of her "personal hygiene."  (*Id.*)  Plaintiff does not do laundry or prepare

any meals.  (Tr. 60-61.)  She rarely leaves the home.  (Tr. 61.)  Plaintiff has no hobbies, but she

does watch television for fun.  (*Id.*)

In response to questioning from her attorney, Plaintiff explained that she does not drive.

(Tr. 62.)  She is scared of people and death.  (*Id.*)  When she loses her temper, she gets very angry,

"loses control," "breaks things," and sometimes hurts people.  (*Id.*)  She has "hurt" family members

before.  (Tr. 62-63.)  She has multiple pets, including a service dog, but her "brother takes care of

them."  (Tr. 63.)  Her anxiety causes her to bite her nails and scratch her skin.  (Tr. 64.)  Plaintiff

has a homecare provider that "helps clean around, gives [her] food, [and] helps [her] organize

things." (*Id.*) According to Plaintiff, the "biggest reason, the biggest problem" that keeps her from working is her bipolar disorder. (Tr. 64-65.)

The vocational expert, Mr. Rue,[22] testified that Plaintiff had no prior work. The ALJ asked the following hypothetical:

> I would like you to assume an individual of the claimant's age, education, and vocational background. This hypothetical individual has the ability to perform a full range of work at the medium exertional level, except the individual is capable of understanding, remembering, and carrying out only simple instructions, and making simple decisions. The individual can tolerate occasional interaction with coworkers, supervisors, and the public, and can adapt to occasional changes in the work routine. Considering just these limitations, are there jobs in the national economy that such an individual could perform?

(Tr. 66.) Mr. Rue responded "Yes, Your Honor." (*Id.*) The VE, Mr. Rue, identified the following three jobs:

1) Cleaner: 56,000 jobs available nationally;

2) Dry Janitor: 63,000 jobs available nationally; and

3) Motor Vehicle Assembler: 213,000 jobs available nationally.

(Tr. 67.) For the second hypothetical, The ALJ presented the following information to the VE:

> [P]lease assume an individual of the claimant's age, education, and vocational background, with the ability to perform a full range of work at the medium exertional level, except the individual is capable of understanding, remembering, and carrying out only simple instructions, but not at a production rate pace, such as on an assembly line or conveyer belt. The individual can tolerate occasional interaction with coworkers and supervisors, but should have no interaction with the public, and the individual can adapt to a work routine that is repetitive from day to day with few unexpected changes. Considering just these limitations, would there be jobs in the national economy that such an individual could perform?

(Tr. 67.) Mr. Rue responded that the positions of Cleaner and Dry Janitor would still be available.

(*Id.*) In addition, the vocation of Kitchen Helper (102,000 jobs available nationally) would also

---

[22] Plaintiff's attorney, Mr. Raines, did not have any objections to Mr. Rue's qualifications as a vocational expert. (Tr. 66.)

be available. (*Id.*) The VE concluded that "if an individual is off task 15 percent or more during an average workday," or "absent more than two days per month," the individual "would not be able to maintain employment in the national economy." (Tr. 67-68.) Plaintiff's counsel, Mr. Raines, declined to question the VE. (Tr. 68.)

**D.    The ALJ's Decision**

The ALJ issued a thorough written decision, consisting of fourteen pages of single-spaced type. (Tr. 15-28.) In making her decision, the ALJ applied the five-step method for evaluating disability claims.[23]

The ALJ first found—at Step One—that "this step is not used for redetermining disability at age 18." (Tr. 16 (citing 20 C.F.R. § 416.987(b)).) In considering the severity of Plaintiff's impairments (Step Two), the ALJ determined that Plaintiff had the following "severe" medical impairments: "bipolar disorder, major depressive disorder, generalized anxiety disorder, social anxiety disorder, and adjustment disorder with depressed mood (20 CFR 416.920(c))."[24] (Tr. 17.) In making these determinations, the ALJ summarized the medical evidence of record (which was detailed, thorough, and exhaustive). (Tr. 18-27.)

The ALJ also found that Plaintiff's impairments were not severe enough, singly or collectively, to meet or medically equal one of the listed impairments in the regulations (Step Three). (Tr. 18.) In reaching this conclusion, the ALJ analyzed listings addressing Plaintiff's various physical conditions. (Tr. 17-19.) Specifically, the ALJ performed a detailed assessment

---

[23] The five-step process for determining whether a plaintiff is eligible for benefits will be explained further in the Standard of Review section of this report, *infra* Part II.A.

[24] The ALJ also found that the medical record reflects evidence that Plaintiff has suffered from obesity and high blood pressure; however, "these impairments are mild in nature, such that they do not affect [her] ability to perform basic activities of work." (Tr. 18.) "As such, the [ALJ found] these impairments are not severe." (*Id.*)

of "listings 12.04 and 12.06." (Tr. 18-20 (including the "paragraph B" and paragraph C" criteria).)

In making this finding, the ALJ determined that Plaintiff had "moderate limitation" in the

following paragraph B criteria: 1) understanding, remembering, or applying information; 2)

interacting with others; 3) concentrating, persisting, or maintaining pace; and 4) adapting or

managing oneself. (Tr. 18-19.) "Because [Plaintiff's] mental impairments do not cause at least

two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria were not satisfied."

(Tr. 19.) The ALJ also found that "the evidence fails to establish the presence of the 'paragraph

C' criteria." (Tr. 19.)

The ALJ next assessed Plaintiff's residual functional capacity (RFC) to do physical and

mental work activities. The ALJ made the following RFC finding:

> After careful consideration of the entire record, the undersigned finds that since
> December 11, 2019, the claimant has had the residual functional capacity to
> perform a full range of work at all exertional levels but with the following
> nonexertional limitations: the claimant is capable of understanding, remembering,
> and carryout simple instructions and making simple decisions. She can tolerate
> occasional interaction with coworkers, supervisors, and the public and can adapt to
> occasional changes in the work routine.

(Tr. 20.) In making this finding, the ALJ "considered all symptoms and the extent to which these

symptoms can reasonably be accepted as consistent with the objective medical evidence and other

evidence." (*Id.*)

In considering Plaintiff's symptoms, the ALJ followed the two-step process required by

the regulations. First, she considered "whether there is an underlying medically determinable

physical or mental impairment(s) … that could reasonably be expected to produce the claimant's

pain or other symptoms." (*Id.*) In addressing this inquiry, the ALJ provided a detailed summary

of the medical evidence in the record.[25]  (Tr. 18-27.)  After assessing the evidence regarding Plaintiff's impairments, the second step of the analysis required the ALJ to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations." (Tr. 20.)  In performing this evaluation, the ALJ was required to make a finding on the credibility of Plaintiff's "statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms." (*Id.*)

Ultimately, the ALJ found that Plaintiff suffered from numerous "medically determinable impairments . . . however, the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 22.)  The ALJ explained that the medical evidence—"objective findings"—"fail to provide strong support for the claimant's allegations of disabling symptoms and limitations." (*Id.*)  The ALJ continued that the "medical findings do not support the existence of limitations greater than those" described in the RFC. (*Id.*)  In making this determination, the ALJ "reviewed and considered all of the evidence of record, including any exhibits not specifically cited herein." (*Id.*)

The ALJ also considered the medical opinion evidence. (Tr. 21-27.)  The ALJ began by evaluating the "Third-Party Function Report completed by Perla Basulto Rivera, who is the claimant's cousin, but also home health provider." (Tr. 21.)  The ALJ noted that Mrs. Rivera's function report is "generally consistent with statements made by" Plaintiff; however, the "regulations consider her to be a non-medical source who has not seen the claimant in a professional medical capacity." (Tr. 21-22.)  Furthermore, "the evidence does not establish that

---

[25] In addition, the ALJ summarized and considered Plaintiff's testimony at the evidentiary hearing. (Tr. 18-21.)

she has any medical training." (Tr. 22.) "Additionally, her statements were primarily observations of the claimant's ability to function, rather than opinions as to the claimant's maximum functional capacity." (*Id.*) In any event, Mrs. Rivera "spends about 16 hours per week with the claimant helping her with grooming and cleaning," as such, she "is in the best position to provide this type of anecdotal testimony." (Tr. 21-22.)

Next, the ALJ evaluated the opinions of consultative psychologists Drs. Monica Hernandez, Ph.D., Michael Heffernan, Ph.D., and Elise Garza Sanchez, M.D. (Tr. 22-25.) Dr. Hernandez opined that Plaintiff "could understand, carryout, and remember instructions, but could not sustain concentration and persistence in a work-related activity at a reasonable pace," that she "could not maintain effective social interaction on a consistent independent basis with supervisors, coworkers, and the public and that she experiences difficulty coping with pressures of a competitive work setting." (Tr. 23.) The ALJ found these opinions "not persuasive" and "not consistent with the other evidence of record." (*Id.*) However, the ALJ found "Dr. Hernandez's opinion [ ] somewhat consistent with the opinion of Dr. Heffernan." (*Id.*)

As to Dr. Hernandez's findings:

> He then opined that the claimant would have difficulty completing work-related tasks over a sustained period and that her adaptive functioning job stress would be expected to adversely affect her ability to function normally in an employment related situation and her functional assessment indicated that the claimant was not able to understand and learn instructions involving job-related tasks, applying information, and carrying out instructions involving job-related tasks, remembering job instructions, sustaining concentration and persistence in work activity at a reasonable pace, maintaining an effective social interaction consistently with supervisors, coworkers, and the public, or deal with normal pressures in a competitive work setting.

(Tr. 24-25.) The ALJ concluded that "[w]hile these opinions are general supported by the significant findings on Dr. Heffernan's mental status evaluation of the claimant, they are not persuasive because they are not consistent with the prior consultative psychological evaluation, or

the claimant's treatment records with Dr Sanchez." (Tr. 25.) Specifically, Dr. Sanchez's treatment records repeatedly reflected improved "clinical examination findings." (*Id.*)

The ALJ noted the "prior administrative medical findings from state mental health consultants, Dr. Mark Schade, Ph.D., and Dr. Joel Forgus, Ph.D." (Tr. 26.) She found the opinions "generally supported by the explanations these doctors provided in their review of the record completed at the time their opinions were given[,] [h]owever, they both are only somewhat persuasive as neither adequately address the claimant's subjective reports of depression." (*Id.*) Finally, the ALJ addressed Plaintiff's therapist, Martha Adame, LPC. (Tr. 27.) Ms. Adame's "findings were generally supported by [her] treatment records," however, they were inconsistent with Plaintiff's "longitudinal treatment records" which reflected "inconsistent mental status findings. (*Id.*)

Next, the ALJ found that Plaintiff did not have any past relevant work (Step Four). (Tr. 27.) In considering whether Plaintiff could perform any jobs in the national economy (Step Five), the ALJ relied on the testimony of the vocational expert, Mr. Rue. In particular, Mr. Rue opined that given the ALJ's RFC finding, Plaintiff could perform several other jobs, including a cleaner II, dry janitor, and a motor vehicle assembler. (Tr. 28.) From this, the ALJ concluded that Plaintiff is not disabled.

### E.    Procedural History

Plaintiff sought administrative review of the ALJ's decision. The Appeals Council concluded that there was no basis for challenging the decision, rendering it the Commissioner's final decision for purposes of judicial review. The instant action followed in which Plaintiff seeks review of the decision pursuant to 42 U.S.C. § 405(g). (Docket No. 1.) Pending are the parties

cross-motions for summary judgment. (Docket Nos. 12, 15.) The issues have been briefed by the parties and will be analyzed in light of the applicable standard of review.

## II. ANALYSIS

### A.   Standard of Review

To qualify for benefits under the Social Security Act (the "Act"), Plaintiff bears the burden of proving that she is disabled. 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); *see also Fraga v. Bowen*, 810 F.3d 1296, 1301 (5th Cir. 1987) (citing *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983)). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at §§ 423(d)(3), 1382c(a)(3)(D).

To determine whether a claimant is disabled within the meaning of the Act, the Commissioner applies the following five-step inquiry:

(1)   whether the claimant is currently working in substantial gainful employment;

(2)   whether the claimant suffers from a severe impairment;

(3)   whether the claimant's severe impairment is sufficient under the pertinent regulations to support a finding of disability;

(4)   whether the claimant is capable of returning to his or her past relevant work; and, if not,

(5)   whether the impairment prevents the claimant from performing certain other types of employment.

*See* 20 C.F.R. §§ 404.1520, 416.920.

A finding that a claimant is disabled or not disabled at any point in the five-step inquiry is conclusive and terminates the analysis. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). At Steps One through Four, the burden of proof rests upon the claimant to show that she is disabled. If the claimant satisfies this responsibility, the burden then shifts to the Commissioner at Step Five of the process to show that there is other gainful employment that the claimant is capable of performing despite her existing impairments. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). Although the burden is initially on the Commissioner at Step Five, once the Commissioner makes a showing that the claimant can perform other work, the burden shifts back to the claimant to rebut the finding that there are jobs that exist in significant numbers that the claimant could perform. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "Throughout the process, the ultimate burden of establishing disability remains with the claimant." *Strempel v. Astrue*, 299 F. App'x 434, 437 (5th Cir. 2008) (citing *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983)).

In this case, the ALJ found at Step Four that Plaintiff had no past relevant work. At Step Five, the ALJ found, based on the vocational expert's testimony, that Plaintiff was not disabled because she could perform jobs existing in significant numbers in the national economy. In light of this evidence that Plaintiff could perform other work, the ultimate burden of proof remained with the Plaintiff.

A federal court's review of the Commissioner's final decision is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Masterson*, 309 F.3d at 272.

Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* Evidentiary conflicts are for the Commissioner to resolve, not the courts. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). This Court may neither reweigh the evidence in the record, nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if substantial evidence is present. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988). In applying this deferential standard, however, the Court is not a "rubber stamp" for the Commissioner's decision, particularly given the importance of the benefits in question. *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985); *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 500 (S.D. Tex. 2003).

**B.    Issues**

In seeking review of the Commissioner's denial of benefits, Plaintiff claims that the ALJ erred in the following two ways: 1) by failing to "consider evidence of special education, highly structured environments, and prior findings"; and 2) by failing to properly determine her mental residual functional capacity (RFC). (Docket No. 12, at 1.) The Commissioner argues that the ALJ did not commit reversible error because "the ALJ properly considered the record evidence and assessed Plaintiff's RFC in this case," and, as such, "[t]he Court should affirm the ALJ's well-supported decision." (Docket No. 15-1, at 1-2, 5-10.)

**C.    Educational Evidence of Record**

As noted, Plaintiff's first claim is that the ALJ committed reversible error by failing to "consider evidence of special education, highly structured environments, and prior [administrative] findings." (Docket No. 12, at 1.) In support of her first claim, Plaintiff cites to

Social Security Ruling 11-2p. (*Id.* at 20-23.) The Commissioner argues that the ALJ's written decision "shows that the ALJ properly considered [and] complied with SSR 11-2p." (Docket No. 15-1, at 7.) In addition, the Commissioner argues that "Plaintiff has not shown prejudice from the ALJ's alleged failure to follow SSR 11-2p," and that ultimately, the ALJ's RFC determination is supported by substantial evidence. (Docket No. 15-1, at 7-10.)

Social Security Ruling 11-2p details specific guidance with respect to the evaluation of disability in young adults, who it defines as "people between the ages of 18 to approximately 25."[26] SSR 11-2p, 2011 WL 4055665, at *1 (Sept. 12, 2011). Born on December 18, 2000, Plaintiff was 22 years old when her application for continued SSI benefits was denied, and thus, she qualifies as a "young" adult. "The same definition of disability, rules, and five-step sequential evaluation process apply to young adults as to older adults." *Joseph G. v. Comm'r of Soc. Sec.*, No. 1:21-CV-46, 2024 WL 641264, at *5 (W.D.N.Y. Feb. 15, 2024) (quoting SSR 11-2p, 2011 WL 4055665 at *2)). Social Security Ruling 11-2p "instructs that ALJs consider evidence from other sources who are not medical sources, but who know and have contact with the young adult, such as family members or educational personnel [,] to assist in evaluating the severity and impact of a young

---

[26] The Ninth Circuit has explained the role of SSRs in the following way:

SSRs, according to the governing regulations, "are binding on all components of the Social Security Administration" and "represent precedent final opinions and orders and statements of policy and interpretations" of the SSA. 20 C.F.R. § 402.35(b)(1); *see also Heckler v. Edwards,* 465 U.S. 870, 873 n.3 (1984) (noting the function of SSRs). "SSRs reflect the official interpretation of the [SSA] and are entitled to 'some deference' as long as they are consistent with the Social Security Act and regulations." *Avenetti v. Barnhart,* 456 F.3d 1122, 1124 (9th Cir. 2006) (quoting *Ukolov v. Barnhart,* 420 F.3d 1002, 1005 n.2 (9th Cir. 2005)). SSRs do not carry the "force of law," but they are binding on ALJs nonetheless. *See Quang Van Han v. Bowen,* 882 F.2d 1453, 1457 & n.6 (9th Cir. 1989).

*Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009).

adult's impairment(s)." *Joseph G.*, 2024 WL 641264, at *5 (quoting *Samuel v. Comm'r of Soc. Sec.*, 2015 WL 5774850, at *13 (E.D.N.Y. Sept. 30, 2015)).

The Court in the *Joseph G.* continued explaining SSR 11-2p as follows:

> SSR 11-2p also addresses the task of extrapolating a young adult's work-related limitations from his performance in school. The SSR acknowledges that:

>> The young adult's ability to function in settings that are less demanding, more structured, or more supportive than those in which people typically work does not necessarily show how the young adult will be able to function in a work setting.... The more extra help or support of any kind that a young adult receives because of his or her impairment(s), the less independent he or she is in functioning, and the more severe we will find the limitation to be.

SSR 11-2p, 2011 WL 4055665, at *7-*8. SSR 11-2p also recognizes that "evidence about a young adult's functioning from school programs, including [individualized education plans] ... may indicate how well a young adult can use his or her physical or mental abilities to perform work activities." *Id.* at *7. SSR 11-2p identifies certain "examples of school-reported difficulties [that] might indicate difficulty with work activities," including:

> [d]ifficulty in understanding, remembering, and carrying out simple instructions and work procedures during a school-sponsored work experience;
> [d]ifficulty communicating spontaneously and appropriately in the classroom;
> [d]ifficulty with maintaining attention for extended periods in a classroom;
> [d]ifficulty relating to authority figures and responding appropriately to correction or criticism during school or a work-study experience; [and]
> [d]ifficulty using motor skills to move from one classroom to another.

*Id.*

SSR 11-2p, requiring examination and discussion of a claimant's school records, is binding on the ALJ in this case. *Heckler v. Edwards*, 465 U.S. 870, 873 n. 3 (1984) (Social Security Rulings are binding on all SSA decision-makers); *Samuel*, 2015 WL 5774850, at *13 (remanding where ALJ failed to review school records, including school psychologist records, in conflict with SSR 11-2p).

*Joseph G.*, No. 2024 WL 641264, at *6. "Yet although SSR 11-2p provides detailed guidance on a wide variety of other sources that the ALJ may find helpful in evaluating a young adult's functional capacity, it does not mandate the evaluation of each source in every case." *Natalie L. v. Comm'r of Soc. Sec.*, No. 23-CV-6712, 2025 WL 957580, at *5 (W.D.N.Y. Mar. 31, 2025). "Rather, the ALJ's duty is simply to 'consider all relevant evidence in the case record to determine whether [the] young adult is disabled.'" *Natalie L.*, 2025 WL 957580, at *5 (quoting SSR 11-2p, 2011 WL 4055665, at *4); *see also SSR 11-2p,* 2011 WL 4055665, at *18 (requiring review only of "all of the *relevant* evidence" prior to a finding about disability). Stated another way, "[t]he evidence relevant to the young adult's disability is 'based on the facts of the case.'" *Natalie L.*, 2025 WL 957580, at *5 (quoting SSR 11-2p, 2011 WL 4055665, at *4).

Not surprisingly, the parties disagree about the ALJ's consideration and treatment of Plaintiff's past records. Specifically, Plaintiff argues that the ALJ "***did not review any***" and "***did not consider***" her special education records, prior sheltered environment, or her prior agency determination. (Docket No. 12, at 19, 21, 23 (emphasis added).) On the other hand, the Commissioner argues that "the ALJ specifically noted that Plaintiff had a long history of being in special education, that she was placed in special education in first grade, and that Plaintiff's claim was an age eighteen redetermination of disability." (Docket No. 15-1, at 7 (citing Tr. 22, 24).) The Commissioner continues "that the ALJ's recognition [of these facts] shows that the ALJ properly considered [and] complied with SSR 11-2p." (*Id.* (citing Tr. 15, 22, 24).)

To be sure, in her decision finding that Plaintiff was "not disabled," the ALJ stated the following:

- "The claimant is an individual who received [SSI] benefits based on disability as a child";

28

- "[E]ligibility for these disability benefits was redetermined under the rules for determining disability in adults when the claimant attained age 18";

- "The claimant was notified that she was found no longer disabled as of December 11, 2019, based on a redetermination of disability under the rules for adults who file new applications";

- "This is an age 18 redetermination with a comparison point decision of July 30, 2018 and disability end date of December 2019";

- Plaintiff has "a long history of being in special education due to intellectual difficulties with her mother describing [her] as 'slow to learn'";

- Plaintiff "was placed in special education starting in first grade and was diagnosed with attention deficit hyperactivity disorder at age 5"; *and*

- "The undersigned has reviewed and considered all of the evidence of record, including any exhibits not specifically cited herein."

(Tr. 15, 17, 22, 24.)  Furthermore, in her evaluation of the "paragraph B criteria," the ALJ found that Plaintiff had "moderate difficulties" in "learning, recalling, and using information to perform work related activities," and also in "focusing attention on work activities and staying on task."[27] (Tr. 18-19.)

Plaintiff's first claim of reversible ALJ error fails for several reasons.  First, although the ALJ could have been more detailed, the ALJ's decision makes clear that she was aware of

---

[27] "The Court recognizes that the ALJ's consideration of Plaintiff's school accommodations in connection with weighing the paragraph B criteria does not transfer to the ALJ's assessment of a claimant's RFC."  *Page v. Comm'r of Soc. Sec.*, No. 1:22-CV-965, 2024 WL 345851, at *11 (E.D. Cal. Jan. 30, 2024), report and recommendation adopted sub nom. *Alexandra Madelyn Page, v. O'Malley*, No. 1:22-CV-965, 2024 WL 664409 (E.D. Cal. Feb. 16, 2024).  "However, just as she did in connection with the paragraph B criteria, the ALJ also acknowledged the accommodations in her assessment of RFC."  *Id.*  This is further addressed in the next section.  *See infra* Part II.D.

Plaintiff's educational records as well as her prior administrative decision. Plaintiff's assertion to the contrary is speculative to say the least, if not wholly conclusory.

Next, even if the ALJ had failed to review and/or consider Plaintiff's school records and prior administrative decision—which does not appear to be the case here—that alone would not necessarily be cause for a remand. While it is true that the ALJ never cited to SSR 11-2p,[28] procedural perfection is not required unless it affects the substantial rights of a party. *Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (citing *Mays v. Bowen,* 837 F.2d 1362, 1364 (5th Cir. 1988) ("Procedural perfection in administrative proceedings is not required" as long as "the substantial rights of a party have not been affected.")); *see also Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (applying harmless error analysis in the disability benefits context). Procedural errors are prejudicial and warrant a remand "only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen,* 864 F.2d 333, 335 (5th Cir. 1988); *see also Newton,* 209 F.3d at 458 (holding that an ALJ's failure to request additional information required reversal "only if the applicant shows prejudice").

Finally, as noted, the ALJ did recognize Plaintiff's school records documenting her special education accommodations, as well as her prior administrative decisions in the record. *See Hindsman v. Berryhill*, No. 17-CV-3612, 2018 WL 4568598, at *11 (E.D. Pa. Sept. 24, 2018) (The Court found it significant that in the decision the "ALJ [ ] recognized the school records documenting special education services and a diagnosis of learning disorder and borderline intellectual functioning."). Furthermore, the ALJ considered the diagnoses evidenced in the school records as reflected in the RFC, restricting Plaintiff to dealing with simple instructions, making

---

[28] Of course, the better practice would have been for the ALJ to specifically cite to SSR 11-2p in her decision.

simple work-related decisions, tolerating occasional interaction with supervisors, co-workers, and

the public, and being able to adapt to occasional changes. (*See* Tr. 20.)  In short, if the ALJ erred

in failing to specifically cite to SSR 11-2p, such error was harmless and does not warrant remand

under the circumstances of this case.  Stated another way, Plaintiff has failed to show prejudice as

to her first issue asserting ALJ error.[29]

## D.    The ALJ's Mental RFC Determination

As noted, Plaintiff's second claim is that the "ALJ err[ed] by wholly or partially rejecting

every medical opinion, reinterpreting the raw medical data, and substituting her lay opinions for

those of the physicians."  (Docket No. 12, at 23.)  Defendant responds that the "ALJ did not

improperly derive Plaintiff's RFC."  (Docket No. 15-1, at 9.)  Specifically, the Commissioner

argues that the "Court should affirm the ALJ's decision" because the record shows that she

"carefully review[ed] the record, delineate[d] her findings with attention to the full record, and

point[ed] to substantial evidentiary support for her findings."  (*Id.* at 10.)

To begin with, the ALJ assessed Plaintiff's residual functional capacity (RFC) to do

physical and mental work activities as follows:

> After careful consideration of the entire record, the undersigned finds that since
> December 11, 2019, the claimant has had the residual functional capacity to
> perform a full range of work at all exertional levels but with the following
> nonexertional limitations: the claimant is capable of understanding, remembering,
> and carryout simple instructions and making simple decisions.  She can tolerate
> occasional interaction with coworkers, supervisors, and the public and can adapt to
> occasional changes in the work routine.

---

[29] Not surprisingly, Defendant acknowledges both of Plaintiff's enumerated issues; however, the Commissioner decided to "address both issues as part of the RFC discussion." (Docket No. 15-1, at 2 & n.1.)  In any event, the undersigned will likewise include Plaintiff's first issue in its discussion of her second issue.

(Tr. 20.)  In making her RFC finding, the ALJ summarized—in great detail—the relevant medical evidence in the record.  (Tr. 20-27.)  The ALJ also acknowledged the relevant medical source opinions in the record.  (Tr. 21-27.)

Specifically, in her opinion she addressed the medical opinions of the following: 1) Ms. Rivera (home health provider); 2) Dr. Hernandez, Ph.D., a consultative psychologist; 3) Dr. Heffernan, Ph.D., a consultative psychologist; 4) Dr. Sanchez, MD (psychiatrist); 5) Drs. Schade and Forgus, the state agency mental health consultants; and 6) Ms. Martha Adame (LPC).[30]  (*Id.*)  In addition, in accordance with the regulations, the ALJ "considered the medical opinion(s) and prior administrative medical finding(s)," including the persuasiveness and consistency of the opinions.  (Tr. 20 (citing 20 C.F.R. § 416.920c)); *see Pearson v. Comm'r of Soc. Sec.*, 20-cv-166, 2021 WL 3708047, at *4–5 (S.D. Miss. Aug. 11, 2021), *report and recommendation adopted*, 2021 WL 3663073 (S.D. Miss. Aug. 18, 2021).

"[F]ederal regulations require ALJs to assign each medical opinion a weight and explain the reasons for that weight."  *Winston v. Berryhill*, 755 F. App'x 395, 402 (5th Cir. 2018).  As relevant here, the *Pearson* court has explained how the current regulations apply to medical opinions as follows:

> Since [Plaintiff] filed for SSI and DIB "on or after March 27, 2017," the ALJ was required to apply the new regulations. 20 C.F.R. § 404.1520c. Through the new regulations, the Administration revised the procedures and standards for evaluating medical opinions and prior administrative medical findings, abrogating the treating physician rule. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c(a). As such, ALJs are "no longer required to give controlling weight" to the opinions of treating physicians. *See, e.g., Pearson v. Commissioner*, No. 20–CV–3030 (AMD), 2021 WL 3373132, at *4–*5 (E.D.N.Y. Aug. 3, 2021). Instead, the ALJ considers the persuasiveness

---

[30] The ALJ also addressed the medical opinions of Drs. Calvo, Reid, and Ligon, who collectively evaluated Plaintiff's physical conditions.  (Tr. 25-26.)  Again, Plaintiff does not challenge any of ALJ's determinations as they relate to her physical medical conditions.

of medical opinions from different medical sources. 20 C.F.R. § 404.1520c(b)(2). In evaluating persuasiveness, the ALJ considers five factors: (i) supportability; (ii) consistency; (iii) the source's relationship with the patient; (iv) the source's specialty; and (v) "other factors that tend to support or contradict" the opinion. 20 C.F.R. § 404.1520c(c). The most important factors in evaluating persuasiveness are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). In considering these factors, the ALJ is required to "*explain how* [h]e considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [Plaintiff's] determination or decision." *Id.* (emphasis added).

With respect to "supportability," "the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase." *Vellone v. Saul*, 1:20–CV–00261–RAK–HP, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) (citing 20 C.F.R. §§ 404.1520c(c)(1)). *See also* Revision to Rules, 82 Fed. Reg. at 5853. The regulations provide that "consistency" is "an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Id.* (citing 20 C.F.R. §§ 404.1520c(c)(2)). *See also* Revision to Rules, 82 Fed. Reg. at 5853.

….

[…] While the new regulations eschewed "hierarchies of medical sources" and are not meant to "make evaluating evidence more difficult," Revision to Rules, 82 Fed. Reg. at 5853, it is clear that an ALJ's sufficient explanation of the supportability and consistency of medical opinions is still a critical portion of the analysis. To be sure, the ALJ is no longer required to undertake a similarly detailed analysis in rejecting a treating physician's medical opinion as persuasive. Cf. *Newton*, 209 F.3d at 454. Therefore, adequate discussion of medical opinion persuasiveness is important.

[…] Most courts to address the issue appear to require the ALJ to provide a sufficient explanation of consistency and supportability to allow the court to undertake a meaningful review of whether his reasoning was supported by substantial evidence, *see, e.g., Ramirez v. Saul*, No. SA–20–CV–00457–ESC, 2021 WL 2269473, at *6 (W.D. Tex. June 3, 2021); *Todd*, 2021 WL 2535580, at *9; *Burba v. Comm'r of Soc. Sec.*, No. 1:19–CV–905, 2020 WL 5792621 (N.D. Ohio Sept. 29, 2020), and do not leave the Court to merely speculate about reasons behind the ALJ's persuasiveness finding or lack thereof, *see, e.g., Moore*, 2021 WL 754833, at *3; *Ramirez*, 2021 WL 2269473, at *6. Stated differently, there must be a discernible "logic bridge" between the evidence and the ALJ's persuasiveness finding. *Ramirez*, 2021 WL 2269473, at *6. Therefore, while the length of explanation need not be profound, *see, e.g., Vaughn v. Comm'r of Soc. Sec.*, No. 20–CV–1119–TMP, 2021 WL 3056108, at *9 (W.D. Tenn. July 20, 2021) (finding detailed three sentence explanation sufficient to be considered an explanation),[4] the ALJ must do more than pay lip service to the regulation without *substantively* engaging with the supportability and consistency

of medical opinions in any detail whatsoever, *see, e.g., Howard D. v. Saul*, No. 5:19–CV–01615 (BKS), 2021 WL 1152834, at *12 (N.D.N.Y. Mar. 26, 2021). In other words, the ALJ cannot summarize the entire record and summarily conclude that, in light of that record, one medical opinion is persuasive and the other is not persuasive. *Raymond M. v. Comm'r of Soc. Sec.*, No. 5:19–CV–1313 (ATB), 2021 WL 706645, at *10 (N.D.N.Y. Feb. 22, 2021).

*Pearson*, 2021 WL 3708047, at *4–5.

Here, in assessing Plaintiff's mental RFC, the ALJ appears to have reached her determination by combining multiple medical sources. For example, beginning with Ms. Rivera, Plaintiff's home health provider, the ALJ found her to be a "non-medical source" whose "statements were primarily observations of [Plaintiff's] ability to function, rather than opinions as to [her] maximum functional capabilities." (Tr. 22.) Notwithstanding this, the ALJ recognized that Ms. Rivera was in a good position to provide "anecdotal testimony relating to [Plaintiff's] ability to function," as such, the ALJ considered "her allegations . . . as evidence of [Plaintiff's] functional limitations." (*Id.*)

Next, the ALJ considered Plaintiff's two primary treating medical sources; Dr. Sanchez and LPC Adame. (*See* Tr. 25, 27.) Plaintiff was treated by Dr. Sanchez from October 2019 to January 2023. *See supra* n.12. Dr. Sanchez repeatedly noted Plaintiff's symptoms associated with depression and anxiety. On the other hand, Plaintiff regularly showed appropriate mood and affect, and she also reported an improvement to her condition. Consistent with this, Dr. Sanchez concluded on the majority of her visits that Plaintiff's symptoms were either partially or completed controlled by her medications. *See supra* Part I.B.1. The ALJ highlighted these positive findings in her assessment of both the medical evidence, as well as in her mental RFC assessment. (Tr. 25.)

As to LPC Adame, Plaintiff began seeing her for mental health treatment in September of 2021, and she continued seeking her professional services until January 2023. (*See* Tr. 1516-32.)

Similar to her relationship with Dr. Sanchez, Plaintiff's relationship with LPC Adame reflected ups and downs in her condition. LPC Adame noted her feelings of depression and anxiety, but on many occasions, Plaintiff expressed that she was feeling good and/or doing better. *See supra* Part I.B.1. In addition, in LPC Adame's professional opinion, Plaintiff was receptive to her counseling services and LPC Adame felt that many of the sessions with Plaintiff went well.

In a mental impairment questionnaire, LPC Adame "opin[ed] that [Plaintiff] had marked or extreme limitations in all areas under understanding and memory, sustained concentration and persistence, and social interaction." (Tr. 27 (citing Tr. 1484-86).) The ALJ noted that "[t]hese findings were ***generally supported*** by Ms. Adame's treatment records that document [Plaintiff's] ***subjective reports***." (Tr. 27 (emphasis added).) However, the "longitudinal treatment records . . . ***fail to corroborate*** the severity of [Plaintiff's] subjective report or the opinions of Ms. Adame." (*Id.* (emphasis added).)

In addition to her treating sources, Plaintiff was also evaluated by consultative psychologists Drs. Hernandez and Heffernan. (Tr. 22-25 (citing Tr. 1302-07, 1425-29).) These evaluations took place in 2019 and 2020; respectively. After assessing Plaintiff, Dr. Hernandez diagnosed her with the following: 1) major depressive disorder, severe; 2) generalized anxiety disorder; and 3) social anxiety disorder. (Tr. 1305.) She continued to assess Plaintiff with the following mental RFC:

> [Plaintiff] can understand, carry out, and remember instructions. She cannot sustain concentration and persist in a work-related activity at a reasonable pace. She cannot maintain effective social interaction on a consistent and independent basis with supervisors, co-workers, and the public. She experiences difficulties coping with the pressures of a competitive work setting.

(Tr. 1306.) The ALJ did not find Dr. Hernandez's mental RFC "persuasive." (Tr. 23 ("These opinions are not persuasive.").) Specifically, she did not find Dr. Hernandez's opinions "consistent with the other evidence of record," showing contrary findings.[31] (*Id.*)

Dr. Heffernan appears to have used similar methodology in his evaluation of Plaintiff, although it was accomplished via "telehealth/video technology." (*See* Tr. 1425-29.) Ultimately, Dr. Heffernan diagnosed Plaintiff with adjustment disorders (with depressed mood) and educational problems. (Tr. 1428.) His assessment of Plaintiff's mental RFC was the following:

> [Plaintiff] is not able to understand, and learn instructions involving job-related tasks. She is not able to apply information, and carry out instructions involving job-related tasks. She is not able to remember job instructions. She is not able to sustain concentration and persist in work-related activity at a social interaction consistently, with supervisors, co-workers, and the public. She is not able to deal with normal pressures in a competitive work setting.

(Tr. 1428-29 (internal citations omitted).) Here again, the ALJ did not find Dr. Heffernan's opinions as to Plaintiff's mental RFC persuasive. (Tr. 25.) Specifically, the ALJ found his opinions "generally supported by the significant findings on Dr. Heffernan's mental status evaluation of [Plaintiff], they are not persuasive because they are not consistent with the prior consultative psychological evaluation, or [Plaintiff's] treatment records with Dr. Sanchez."[32] (*Id.*)

_____

[31] As relevant here, the ALJ stated that Dr. Hernandez's opinions were inconsistent "with the other evidence of record showing positive clinical findings on her mental status evaluations, particularly with mood and affect, but that they were not of the severity one would expect to result in an inability to sustain concentration and persistence to work activity at a reasonable pace or prevent the claimant from coping with the pressures of a competitive work setting as appointed by Dr. Hernandez." (Tr. 23.)

[32] In addition, the ALJ found Drs. Hernandez and Heffernan's opinions "somewhat consistent"; however, this proved of little probative value because "the mental status evaluation findings of Dr. Heffernan significantly departed from [Plaintiff's] performance on the other mental status testing." (Tr. 24.) Again, this inconsistency is reflected in the ALJ's final RFC determination.

In addition to Drs. Hernandez and Heffernan, Plaintiff's mental RFC was also evaluated by state agency medical experts, Drs. Schade and Forgus. (*See* Tr. 26.) These evaluations likewise took place in 2019 and 2020; respectively. (*See* Tr. 134-41, 1456-58.) Because Dr. Schade found that Plaintiff was only "moderately limited" in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday/workweek without interruptions, he assessed her mental RFC to included her ability to "understand, remember and carry out only detailed instructions, make decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in the routine work setting." (Tr. 139-40.)

As noted, Dr. Forgus's findings were largely consistent with Dr. Schade's. One notable difference is he found Plaintiff "markedly limited" in her ability to carry out detailed instructions. (*Compare* 139-40, *with* Tr. 1456-57.) In any event, Dr. Forgus determined that Plaintiff's mental RFC included her ability to "understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, [and] respond appropriately to changes in routine work setting." (Tr. 1458.)

The ALJ found Drs. Schade and Forgus's opinions "generally supported" by the explanations [they] provided in their review of the record completed at the time their opinions were given." (Tr. 26.) However, the ALJ also found their opinions "only somewhat persuasive as neither adequately address [Plaintiff's] subjective reports of depression." (*Id.*) In particular, the ALJ did not agree with Dr. Schade's finding that Plaintiff could perform "detailed tasks." (*Id.*)

To put a fine point on it, Plaintiff's claims of error turn on the ALJ's mental RFC assessment of her "non-exertional limitations." Specifically, the ALJ assessed her non-exertional limitations to include the following:

- "The claimant is capable of understanding, remembering, and carryout *simple instructions* and making *simple decisions*";
- "She can tolerate *occasional interaction* with coworkers, supervisors, and the public"; and
- She "can adapt to *occasional changes* in the work routine."

(Tr. 20.) In making these findings, Plaintiff contends that the ALJ erred "by wholly or partially rejecting every medical opinion." (Docket No. 12, at 23.) However, that is contrary to the ALJ's decision.

First, in limiting Plaintiff's capabilities to simple instructions and simple decisions, the ALJ appears to have relied primarily on the medical opinions of Drs. Hernandez and Forgus. Specifically, the ALJ's determination here mirrors Dr. Forgus's assessment. (*Compare* Tr. 20, *with* Tr. 26, 1456-58.) In addition, Dr. Hernandez's finding that Plaintiff's ability to understand, carry out, and remember instructions, as it was not limited to just "simple" instructions, also supports the ALJ's mental RFC assessment. (*Compare* Tr. 20, *with* Tr. 23, 1306.)

Next, in limiting Plaintiff's ability to tolerate only occasional interactions with others, the ALJ appears to have relied on the medical opinions of Drs. Hernandez, Heffernan, Schade, and Forgus. As to Drs. Hernandez and Heffernan, both found that Plaintiff was unable to "maintain effective social interaction on a *consistent* basis." (Tr. 23-25, 1306, 1428-29.) On the other hand, Drs. Schade and Forgus found that Plaintiff only had mild limitations in her ability to interact with others at work. (Tr. 26, 140, 1458.) In considering all of these medical opinions, the ALJ decided to limit Plaintiff's ability to interact with others to an "occasional" frequency. (Tr. 20.) This assessment appears to fall in between the limitations assessed by Drs. Hernandez and Heffernan, compared to the ones assessed by Drs. Schade and Forgus. This is not surprising, given the ALJ's determination that Plaintiff's subjective complaints were not fully supported by the medical evidence of record.

Finally, in limiting Plaintiff's ability to adapt to only occasional changes at work, the ALJ appears to have based her findings on the medical opinions of Drs. Schade and Forgus. Both Drs. Schade and Forgus determined that Plaintiff was not significantly limited in her ability to adapt to changes at work. (Tr. 140, 1458.) In limiting Plaintiff to being able to adapt to ***occasional changes*** in the work routine, the ALJ did not go quite as far in her assessment. (*See* Tr. 20.) However, Drs. Schade and Forgus's medical opinion as to Plaintiff's ability to adapt to changes, does tend to the support the ALJ's final assessment in this area.

Here, Plaintiff does not explain how her special education accommodations are inconsistent with the RFC found by the ALJ.[33] The ALJ considered the diagnoses evidenced in school records as reflected in the RFC, restricting Plaintiff to "simple instructions" and "simple decisions," "occasional interaction[s]" with others, and "occasional changes in the work routine."[34] (Tr. 20.) The ALJ explained that she "considered all of the evidence of record" and found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.*) Similar to the court in *Hindsman*, the undersigned finds the ALJ's decision supported by substantial evidence in the record. *See Hindsman*, 2018 WL 4568598, at *12.

In any event, the ALJ provided "a sufficient explanation of consistency and supportability to allow the court to undertake a meaningful review of whether his reasoning was supported by substantial evidence." *See Pearson*, 2021 WL 3708047, at *5. "Stated differently, there [is] a

---

[33] Specifically, Plaintiff's claim of ALJ error focuses on her contention that the ALJ "failed to consider" her previous special education accommodations. (*See* Docket No. 12, at 20-23.)

[34] For example, on January 30, 2020, Plaintiff requested that Dr. Sanchez write a letter to her school to advocate for her need for additional time to complete tasks and take her tests. (Tr. 1415.) This request is consistent with the ALJ's determinations regarding Plaintiff's abilities regarding "simple" instructions, "occasional" interactions, and "occasional" changes in her work routine.

discernible 'logic bridge' between the evidence and the ALJ's persuasiveness finding." *See Pearson*, 2021 WL 3708047, at *5. The record supports the ALJ's conclusion that Plaintiff's mental impairments are not disabling to the extent she cannot sustain meaningful employment. For example, the record shows that although she consistently complains of symptoms related to anxiety and depression, those symptoms wax and wane in severity. (*See* Tr. 1460, 1465, 1466, 1468, 1471, 1510, 1518, 1526, 1527.) Consistent with this, the medical records show that Plaintiff's medications have been effective. (*See* Tr. 1420, 1462, 1464, 1467, 1469, 1473, 1511, 1513, 1515.) Plaintiff has repeatedly presented to her professional medical providers in a cooperative manner, exhibiting a positive mood and/or affect. (*See* Tr. 1422, 1520, 1522, 1529.)

For each of the medical opinions, the ALJ explained how and/or why they were supported and consistent with the record, or how and/or why they were not.[35] (Tr. 25.) "To be sure, the ALJ is no longer required to undertake a [ ] detailed analysis in rejecting a treating physician's medical opinion as persuasive." *Pearson*, 2021 WL 3708047, at *5. Furthermore, "the length of explanation need not be profound." *Id.* In any event, the ALJ's summary of the relevant medical evince and her explanation of her treatment of the medical source opinions—including Drs. Sanchez, Hernandez, Schade, Heffernan, Forgus, and LPC Adame—was not cursory, in fact, far from it. Stated another way, the ALJ's treatment of the persuasiveness—or lack thereof—of the medical opinions is supported by substantial evidence.[36]

---

[35] Furthermore, the ALJ is required to discuss the evidence but "is not always required to do an exhaustive point-by-point discussion." *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (citing *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)). Notwithstanding this, in her decision the ALJ's review and discussion of the medical evidence of record was thorough and exhaustive, to say the least.

[36] However, it bears repeating that the issue is not whether the Court would reach the same conclusion as did the ALJ. *Johnson*, 864 F.2d at 343 ("we may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute our judgment for that of the Secretary, even if the evidence preponderates against the Secretary's decision").

"The Commissioner, rather than the courts, must resolve conflicts in the evidence."[37]

*Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995). In resolving the conflicts in the medical evidence of record, the ALJ did "not leave the Court to merely speculate about reasons behind her persuasiveness finding or lack thereof." *Pearson*, 2021 WL 3708047, at *5. Rather, her reasoning provided a "'logic bridge' between the evidence and her persuasiveness finding" as to the medical opinions, which ultimately provided the support for her RFC determination. *Id.* More importantly, the ALJ's findings—as they related to her RFC determination—are supported by substantial evidence in the record, and Plaintiff's claim to the contrary should be rejected.

## III. CONCLUSION

For the foregoing reasons, the undersigned recommends that Plaintiff's Motion for Summary Judgment (Docket No. 12) be DENIED, that Defendant's Motion for Summary Judgment (Docket No. 15) be GRANTED, that the Commissioner's decision be AFFIRMED, and that this action be DISMISSED.

Due to the detailed medical information summarized in this report, it is **ORDERED** that the Clerk shall file this Report and Recommendation under **SEAL**.

## NOTICE TO THE PARTIES

The Clerk shall send copies of this Report and Recommendation to the parties who have fourteen (14) days after receipt thereof to file written objections pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file timely written

---

[37] Furthermore, "the ALJ has sole responsibility for determining a claimant's disability status," and "the ALJ is free to reject the opinion of *any* physician when the evidence supports a contrary conclusion." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)) (emphasis added). "[T]he ALJ 'is entitled to determine the credibility of *medical experts* as well as lay witnesses and weigh their opinions accordingly.'" *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (quoting *Scott v. Heckler*, 770 F.2d 482, 485) (5th Cir. 1994) (emphasis added)).

objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in this Report and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

DONE at McAllen, Texas on June 30, 2025.

_____
Nadia S. Medrano
UNITED STATES MAGISTRATE JUDGE